UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**DALE RAY BELLAH**,

            Plaintiff,

v.

**CAROLYN W. COLVIN, Acting Commissioner of Social Security**,

            Defendant.

Case No. 6:15-cv-01361-KI

OPINION AND ORDER

Sherwood J. Reese
Drew L. Johnson, P.C.
1700 Valley River Dr.
Eugene, OR 97401

      Attorneys for Plaintiff

Billy J. Williams
United States Attorney
District of Oregon
Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Page 1 - OPINION AND ORDER

John C. Lamont
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

Attorneys for Defendant

KING, Judge:

Plaintiff Dale Bellah brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying his application for a period of disability and disability insurance benefits ("DIB"). I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

Bellah protectively filed an application for DIB on January 3, 2012. The application was denied initially and upon reconsideration. After a timely request for a hearing, Bellah, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on October 23, 2013. On December 5, 2013, the ALJ issued a decision finding Bellah not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on May 28, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's


findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ found Bellah's date last insured was December 31, 2015, and that he had not engaged in substantial gainful activity since his amended onset date of June 5, 2011. The ALJ concluded Bellah's severe impairments included: lumbar spine degenerative disc disease, hepatitis C, chronic obstructive pulmonary disease, status post L4-5 fusion, and neuropathy. These impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

Given these impairments, the ALJ determined Bellah retains the residual functional capacity ("RFC") to perform light work, with a few exceptions. Bellah can frequently climb ramps or stairs, only occasionally climb ladders, ropes, or scaffolds, only occasionally stoop, crouch, or crawl, and frequently kneel. He should avoid moderate exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas. He should avoid concentrated exposure to operational control of moving machinery, hazardous machinery, and unprotected heights. Given these limitations, Bellah cannot perform his past work but could perform other work in the national economy. He could work as a bench worker, inspector of small products, or as a marker of semi-conductor wafers. As a result, the ALJ concluded Bellah did not qualify as disabled under the Act.

## FACTS

Bellah, one month shy of 50 years old as of his amended onset date of disability, has a GED and a work history in mini-storage maintenance, painting, and in a cabinet manufacturing

Page 5 - OPINION AND ORDER

plant.  Before engaging in this work, Bellah received Social Security disability benefits from 1994 until benefits terminated on January 1, 2003.  The record contains no information about this previous period of disability or why benefits were terminated.

In June 2010, about a year before Bellah's amended onset date of disability, Bellah initiated care with Robert Pelz, M.D., Ph.D., to undertake hepatitis C treatment.  Dr. Pelz prescribed interferon and ribavirin.  Over the course of the next several months, Bellah reported increased joint pain and stiffness resulting from the hepatitis injections.  A month into the treatment, Bellah told his primary care physician Laura Jakious, M.D., that he had worked only one day since he started the treatment.  He was taking oxycontin, which relieved his back pain but not his joint pain.  Five weeks into treatment, on a reduced dose of interferon, Bellah told Dr. Pelz "he generally feels better than he did before getting started on treatment and he is pleasantly surprised that his treatment-related side effects are not as bad as he anticipated." Tr. 253.  He was working 3 ½ days a week.  He continued to work part-time into September 2010.  Bellah told Dr. Jakious that he was able to vary his work schedule and take time off at his worst, and she approved a disabled parking permit for him due to mobility problems from the interferon treatment.

By October 2010, Bellah had completed 13 weeks of treatment.  A week or so earlier, he told the nurse he wanted to quit the therapy because he was missing work; he was not even working a day a week at that point.  After talking with Dr. Pelz, he agreed to complete the last 11 weeks of therapy.  By late November, he only had one more treatment to go and had been "tolerating it pretty well." Tr. 296.  Tara Workman, M.D., Bellah's new primary care provider upon Dr. Jakious' retirement, noted Bellah's lumbosacral disc disease and spondylolisthesis was

Page 6 - OPINION AND ORDER

"generally well controlled" and that the increased pain caused by the hepatitis C treatment was "tolerable with the Vicodin." Tr. 297.

In December 2010,[1] Dr. Pelz reported Bellah's viral load was undetectable. Bellah indicated he "feels great, feels healthier than he was prior to starting the hepatitis C treatment." Tr. 245. After a trip to urgent care in late December 2010 for chest tightness, which was thought to be esophageal reflux, Bellah returned to Dr. Workman in March 2011. At that appointment, the two discussed a pain medication contract to cover his Vicodin; sometimes he took four a day and sometimes only one or two. In May, Bellah returned complaining about neck pain, but a c-spine revealed only mild degenerative changes and he exhibited normal grip strength.

At his June medication appointment, after his amended onset date of disability, Bellah told Dr. Workman that he felt progressively worsening pain in his back and toes. Dr. Workman thought he would benefit from a nerve agent medication, but was concerned about the effect on his liver; she instructed him to discuss it with Dr. Pelz. In July, Dr. Workman agreed to provide Bellah with a disability parking sticker for another year because he had difficulty walking and felt burning in his toes. Bellah told Dr. Workman he took the hydrocodone when he needed it, "but does not always have to take it." Tr. 288. The doctor stopped his newly-prescribed Cymbalta because Bellah had recently discovered his liver showed signs of dysfunction.

Three months later, in October 2011, at a follow-up with Dr. Workman, Bellah reported "doing well" with Norco. Tr. 285. He put his pain at six out of ten on average, but he reported trying to exercise regularly and be healthier. Dr. Workman described Bellah as stable with

---

[1]The ALJ failed to distinguish between the December 2010 and the December 2011 appointments in her summary of the medical evidence. Tr. 16.

chronic back, shoulder, and neuropathic pain that was well-controlled. In December 2011, Bellah met with Dr. Pelz who noted Bellah's viral load was undetectable after treatment, but "6 months after completing therapy he relapsed with a detectable hepatitis C viral load." Tr. 242-43. Bellah inquired about other medication options. Dr. Pelz informed him none were on the market and Bellah should come back within a year.

A few days later, Bellah told Dr. Workman most of his pain was in the lower back and sometimes the legs, and he put his average pain at six out of ten. He experienced no side effects from medications but thought the hydrocodone was not helping as much as it used to. He found he was taking as much as seven a day and had to stretch with his pain contract. He also reported hepatitis C treatment would be delayed a year. Dr. Workman prescribed Percocet. However, the Percocet did not really help the neuropathic pain.

A month later, Bellah reported that the Percocet provided 80% relief, but he still experienced neuropathic pain in his toes and feet. In April 2012, Bellah continued to report neuropathic pain, with improvement of his back pain on four tablets a day of Percocet.

At the request of the agency, DeWayde C. Perry, M.D., examined Bellah in May 2012. Bellah described his constant low back pain, which was increased by lying or sitting down for more than an hour, lifting, or repeatedly bending. It helped to change positions and take pain medications. Bellah's main complaint from hepatitis C was fatigue. He occasionally cooked and did the laundry, but he did not perform any yard work. Dr. Perry observed Bellah sitting comfortably during the examination, and without any trouble getting on and off the examination table. Bellah could perform finger-to-nose testing, coordination, heel-to-knee and heel-to-toe transfers. The Romberg test was negative. His straight leg raising was normal sitting and supine,

Page 8 - OPINION AND ORDER

his grasping was completely intact, and his gross and fine motor skills were normal.  Dr. Perry identified mild tenderness to palpation in the midline and the right and left paraspinal lumbar spine, but Bellah exhibited normal strength and sensation.  Bellah then performed 10 jumping jacks, followed immediately by 10 squats, five pushups, and brisk walking for 160 feet.  "The claimant did the aforementioned without any difficulty whatsoever.  His recovery was totally normal."  Tr. 267.  The doctor diagnosed Bellah with failed back syndrome and hepatitis C by history.  Dr. Perry thought Bellah could stand and walk for up to six hours with alternating sitting and standing as needed with breaks every two hours.  He had no sitting limitations.  He could lift 50 pounds occasionally and 25 pounds frequently.  Heavy weights needed to be waist high.  He had no balancing limitations, and he could frequently climb, stoop, kneel, crouch and crawl.  He had no manipulative limitations.

Dr. Workman completed an assessment in July 2012.  She opined Bellah could sit, stand and walk a total of three hours in a day, and that he could never lift anything over ten pounds.  She opined he could not operate push and pull arm controls.  She thought he could never bend or climb, and could only occasionally reach.  During his appointment, Bellah reported worsening pain, taking 1 ½ pills at a time, with only 30% pain relief.  He appeared "[c]omfortable, in no distress" and put his pain at four out of ten, in his back, but reported his average pain as a 7.  Tr. 278.  Dr. Workman refilled Bellah's Percocet, noting chronic back and neuropathic pain, and encouraged him to stay active as much as possible.

Five months later, in December 2012, Bellah returned to Dr. Pelz who discussed hepatitis C treatment options.  Bellah reported "feel[ing] pretty healthy, though he often still gets fatigued."  Tr. 311.  Dr. Pelz described Bellah as pleasant and healthy-looking.  Dr. Pelz noted

Page 9 - OPINION AND ORDER

recent tests suggested "some efficacy of hepatitis therapy." Tr. 312. He directed Bellah to return in a year to evaluate medication options at that time.

At Bellah's appointments with Dr. Workman in January, April and September 2013, Bellah reported improvements in pain, with normal mobility. The doctor continued to prescribe oxycodone.

## DISCUSSION

Bellah challenges the ALJ's treatment of Dr. Workman's opinion, her rejection of his testimony, and her reasoning for questioning the lay witness statements.

I.  Medical Evidence

The ALJ accepted some of Dr. Perry's postural and environmental limitations, but determined that there was no support in the record to require a sit/stand option. The ALJ rejected Dr. Workman's opinion finding it to be "without substantial support from the other evidence of record, which obviously renders it less persuasive, but [also] not supported by the doctor's own examination findings." Tr. 18. Instead, the ALJ gave the greatest weight to the non-examining State agency consultants, who concluded Bellah could stand or walk with normal breaks for at least six hours in an eight-hour day. The ALJ opined that the State agency consultants–who she characterized as "highly qualified physicians"–considered the medical evidence and Bellah's limitations. Tr. 18.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

The ALJ failed to sufficiently explain her reasoning. Although, as the Commissioner points out, the ALJ is permitted to record a "detailed and thorough summary of the facts and conflicting clinical evidence[,]" the ALJ also must "do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). Here, the ALJ generally referred to "other evidence in the record" conflicting with Dr. Workman's opinion. If she meant Dr. Perry's examination findings, she failed to explain why Dr. Workman and Dr. Perry's conclusions about Bellah's need to limit sitting and standing were "not supported by the overall record[;]" Dr. Workman thought he could only stand for one hour, and Dr. Perry opined Bellah could only stand for two hours at a time, for a total of six hours. Tr. 17.

The ALJ also failed to explain what about Dr. Workman's assessment was not supported by the doctor's examination findings. I could possibly infer from the ALJ's summary of Dr. Workman's treatment notes that the ALJ meant that Bellah's being "comfortable and in no distress" conflicted with the doctor's finding on Bellah's sitting, standing, and walking

limitations. However, as Bellah points out, Dr. Workman prescribed narcotic pain medications for him despite his "comfortable" appearance. Perhaps the ALJ found the doctor's recommendation to Bellah to exercise and lead an active lifestyle conflicted with the postural limitations, but she did not say as much. I also find it disconcerting that the ALJ neglected to reference Bellah's March, June, and July 2011 appointments with Dr. Workman. At the latter two appointments, Bellah described the progressively worsening pain in his back and burning in his toes; the doctor agreed to provide Bellah with a disability parking sticker as a result. Further, at his July 16, 2012 appointment, the same day on which Dr. Workman completed her assessment, Bellah reported worsening pain, with only 30% pain relief. Tr. 278, 275. These observations are not obviously inconsistent with Dr. Workman's limitations.

   Certainly, there are reasons to find Dr. Workman's opinion unpersuasive. She completed a check-the-box form, without explaining her opinions, and documentation following her July 2012 assessment reflects Bellah's improvement. Tr. 318 (improvement in pain, mobility normal in Jan. 2013); Tr. 319 (pain at 4/10, improvement in pain, and normal mobility in April 2013); Tr. 322 (no mobility problem, urged to remain active in Sept. 2013). An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is " conclusory, brief, and unsupported by the record as a whole[.]" *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (it is permissible to reject check-off reports from physicians that do not contain any explanation of the bases for the conclusions); *cf. Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014) (opinions in check-the-box form were based on "significant experience" with claimant and "supported by numerous records"). For example, Dr. Workman did not explain why she found Bellah incapable of

pushing and pulling arm controls, or incapable of sitting, standing, or walking for a total of more than three hours, when she urged him to "stay active as much as possible." Tr. 278. Additionally, just two months before Dr. Workman completed her assessment, Dr. Perry observed Bellah perform ten jumping jacks, followed immediately by ten squats, five pushups, and brisk walking for 160 feet without "any difficulty whatsoever" and with a "totally normal" recovery. Tr. 267. Further, Bellah did not complain of neuropathy to Dr. Perry during the May 2012 examination, saying fatigue was the only side-effect of hepatitis C, and demonstrated normal sensation during testing. These are observations the ALJ could have made.

The Commissioner argues the state agency doctors represent the "intermediate position" between the extremes of Dr. Workman and Dr. Perry, but the ALJ did not assert this as a reason supporting her decision. The court cannot "affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal quotation omitted). However, again, this is a conclusion the ALJ could have come to.

In sum, I agree with Bellah that the ALJ failed to give specific and legitimate reasons supported by substantial evidence in the record to find Dr. Workman's opinion entitled to less weight than the State agency consultants' opinions, or to reject the postural limitations identified by Dr. Perry.

II.    Bellah's Testimony

Bellah testified he initially reported his onset date of disability as January 3, 2010 because his family doctor wanted him to quit working at that time due to standing and lifting limitations. Because of Bellah's substantial gainful activity into mid-2011, he amended his onset date to

Page 13 - OPINION AND ORDER

June 5, 2011.  He explained he could work when he was able during his hepatitis C treatment.  He would get help lifting from the other guys on the crew.  He testified he stopped working right around when the treatment ended because "the stuff that I got from the treatment like the anemic, you know, and my body and stuff like that, that's when the doctors was really, you know, coming onto me about I need to back off[.]"  Tr. 45.  When pressed, he also explained that there were fewer hours available for him because of the economic slow-down.  He accepted unemployment benefits, sought work, but did not find employment; he thought it was because he failed physical examinations.  He made several further work attempts, but one job required him to go up ladders occasionally and he thought that would be against medical advice, and another required him to operate a computer which he was not equipped to do.  He understood his doctor wanted him to lie down five hours out of eight.  He reported feeling pain in his hips, knees, legs and feet if he stood for longer than 15 to 20 minutes.  He felt swelling and burning in his feet.  He spent his day in bed, lying in his recliner, and said he could no longer grocery shop.  He testified his doctor told him to stay away from stairs and he could not climb them well.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Here, the ALJ noted Bellah alleges a "high degree of limitation because of his impairments." Tr. 18. She found his testimony conflicted with the medical record, his daily activities, and his ability to work after his initial onset date of disability (before he amended it). She also did not believe that he was only able to sustain work as a painter by relying on coworkers to assist him. She found the record indicated Bellah stopped working in part due to the economic slow-down, and there was no evidence Bellah's medical condition had deteriorated since the company laid him off. Finally, his acceptance of unemployment for two years, during which time he sought work, suggested Bellah felt he was physically and mentally capable of working.

Bellah is correct that in his case his daily activities are not a clear and convincing reason to question his credibility and the Commissioner does not defend this reason. *Orn*, 495 F.3d at 639 (claimant's daily activities might be so substantial such that they equate to an ability to work or the activities might be inconsistent with testimony purporting to be limited in some way). Similarly, because it is not clear whether Bellah held himself out for full or part-time work, his receipt of unemployment benefits cannot be a credibility factor. *Carmickle v. Comm'r, Soc. Sec.*

Page 15 - OPINION AND ORDER

*Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). The Commissioner also does not defend the ALJ's finding that his testimony was inconsistent with the medical record.

As the Commissioner notes, the ALJ properly pointed out Bellah initially alleged an onset date of disability as January 2010, when he continued to work until June 2011. Bellah responds, however, that the medical records reflect he worked very little between June 2010 and December 2010 while receiving hepatitis C treatment. Certainly the ALJ could have questioned an onset date of January 2010 when Bellah did not even begin treatment until June 2010, but the ALJ failed to acknowledge the effect of treatment on Bellah's ability to work between June and December 2010. The ALJ could also have referred to Bellah's report of good health–"healthier than he was prior to starting the hepatitis C treatment"–in December 2010, nearly twelve months after his alleged onset date of disability. This statement is also inconsistent with Bellah's testimony that he stopped working right around when the treatment ended due to the side-effects of treatment. Tr. 45. The ALJ's discussion of these issues was incomplete.

Additionally, without further explanation, Bellah's failed work attempts after his amended onset date of disability are not a clear and convincing reason to question his credibility. For example, Bellah's need to quit the auction work because of his inability to stand for the six hours required to perform the work is not inconsistent with his report that he felt pain when standing for longer than 15 to 20 minutes. The only evidence in the record is that Bellah quit the work because he could no longer perform the work. To make Bellah's failed work attempts a clear and convincing reason, the ALJ must explain how the RFC accounts for those limitations, or how Bellah's testimony about his inability to do that work is not believable.

This leaves only Bellah's less than candid testimony about the reasons for ending work. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (less than candid testimony is proper basis on which to question credibility). Although Bellah refers to his testimony describing being sick and cutting back his work to 20 hours during the hepatitis C treatment, he neglects to mention that only at the ALJ's prompting did Bellah reveal his hours were also cut back because work was slowing down and that he was designated a layoff. Tr. 46. Nevertheless, given his testimony that both his health *and* the economic slow-down resulted in his lay off, I find this reason alone is insufficient to support the ALJ's credibility analysis.

While there are reasons to question Bellah's testimony that the ALJ could explore, the ALJ failed to give clear and convincing reasons supported by substantial evidence in the record.

III.   Lay Witness Testimony

Two lay witnesses offered reports on Bellah's behalf. Bellah's fiancee observed that Bellah cannot stand on his feet for very long, cannot sit for very long, and cannot lift, bend or push. He spends his days watching television or reading. Bellah never prepared any meals. He helped fold clothes. He shopped in stores for food and toiletries twice a month for less than an hour. He uses a cane, uses a motorized cart at stores, and has a handicap sticker. The oxycodone made him sleepy. She described him as very depressed and not able to do the things he used to do.

A relative who lives with Bellah described him needing help getting out of bed some days, getting in and out of the shower, and putting on his socks. She performed all of the grocery

shopping because Bellah could not stand and walk.  He spends his days watching television from his recliner.[2]

The ALJ found these statements to be credible statements of Bellah's activities and gave them some weight.  However, she noted the witnesses are not medical experts, they are biased, the statements do not outweigh the medical evidence of Bellah's limitations, and are unpersuasive for the same reasons Bellah's testimony was not credible.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  *Stout*, 454 F.3d at 1053.  Nothing in the ALJ's analysis reflects that she actually gave the statements any weight.  Further, lack of medical expertise and family bias are not germane reasons to reject lay witness testimony.  *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (cannot reject due to lack of medical training or family bias).  Since the ALJ erred in her credibility analysis of Bellah's testimony, her reasons for finding the lay witness testimony unpersuasive are not supported by substantial evidence in the record.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (acceptable to reject spouse's testimony for same reasons given for claimant if spouse's testimony was similar to claimant's complaints).

IV.     Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits.  *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally

---

[2]The Commissioner indicates both reports may have been prepared by the same person.  Resp. Br. 13, n.3.

sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. *Garrison*, 759 F.3d at 1020. Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

Here, there are issues for the ALJ to address on remand. The ALJ failed to properly disregard Dr. Workman's opinion (and Dr. Perry's postural limitations), but the record might contain sufficient reasons for disregarding those opinions. *McCallister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990). Similarly, because the ALJ failed to provide sufficient clear and convincing reasons to question Bellah's testimony, or the requisite germane reasons to question the lay witness testimony, but the record contains a basis to reject all of their statements, I find a remand for further proceedings is appropriate. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

## CONCLUSION

The decision of the Commissioner is reversed. This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above. Judgment will be entered.

IT IS SO ORDERED.

DATED this   25th   day of May, 2016.

    /s/ Garr M. King
Garr M. King
United States District Judge